**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| JUNE MEDICAL SERVICES, LLC d/b/a HOPE MEDICAL GROUP FOR WOMEN, on behalf of its patients, physicians, and staff,<br><br>       Plaintiffs,<br><br> v.<br><br>STEPHEN R. RUSSO, in his official capacity as Interim Secretary of the Louisiana Department of Health; JIMMY GUIDRY, M.D., in his official capacity as State Health Officer, and JEFF LANDRY, in his official capacity as Attorney General for the State of Louisiana,<br><br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)  Case No. 3:20-cv-229-JWD-EWD<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff June Medical Services, LLC (d/b/a Hope Medical Group for Women) ("Hope"), on behalf of its patients, physicians, and staff, respectfully seeks a temporary restraining order and preliminary injunction enjoining Defendants from enforcing the Louisiana Department of Health's ("LDH") Healthcare Facility Notice/Order #2020-COVID19-All-007 (the "Notice"),[1] dated March 21, 2020, as applied to previability abortion. In the alternative, Hope seeks relief as applied to itself and its patients, physicians, and staff. Hope has been in full compliance of the Notice *for over three weeks.* Defendants' recent actions and application of the Notice, however, would deny Louisianans' access to essential, time-sensitive healthcare and violate their constitutional right to abortion prior to viability.

On its face, the Notice outlines LDH's efforts to "prevent the spread of COVID-19." Notice, preamble. Its stated purpose is to "preserve Personal Protective Equipment (PPE)" and "utilize hospital staffing, equipment, and bed capacity for the transition to the COVID-19 emergency." *Id.* § I. The Notice

---

[1] Ex. A to Compl., La. Dep't of Health, Healthcare Facility Notice/Order #2020-COVID19-All-007 (Mar. 21, 2020) [hereinafter Notice], https://files.constantcontact.com/dd5f31ef601/1e9440a9-14a2-4982-8fb1-a1b129058f8e.pdf.

directs "that any and all medical and surgical procedures <u>SHALL be postponed until further notice</u>," except medical and surgical procedures (1) "to treat an emergency medical condition" or (2) "to avoid further harms from underlying condition or disease." *Id.* (emphasis in original). All other healthcare may be delayed by 30 days, if consistent with the provider's best judgment. *Id.* § 2. For the past three weeks, Hope has fully complied with the Notice. But as now interpreted by Defendants, and through the recent affirmative steps taken by Defendant Landry to close all abortion clinics (including public threats and unfounded "investigations"), the effect of the Notice—which has ***no time limitation***—is to ban the provision of previability abortion care in Louisiana for the foreseeable future.[2] Further, the application of the Notice to preclude abortion care at Hope would ban abortion in the Northern part of the state, where Hope is the sole provider.

Like similar efforts to restrict abortion in other states during the COVID-19 crisis, Defendants' application of the Notice contravenes the guidance of leading health and medical authorities. The American Medical Association ("AMA") cautioned that such attempts by state officials—like Defendants here—are "exploiting this moment" and warned that "physicians—not politicians—should be the ones deciding which procedures are urgent-emergent and need to be performed."[3] The American College of Obstetricians and Gynecologists ("ACOG") and seven other leading medical and health organizations also made clear that, during the COVID-19 pandemic, abortion is essential care because it cannot be delayed without risking the health and safety of the patient.[4]

---

[2] There is good reason to believe that these measures will continue for many weeks, and likely months. *See* Bobby Allyn, *To Fight Virus. Trump Extends Social Distancing Guidelines for 30 more Days*, NPR (Mar. 29, 2020), https://www.npr.org/2020/03/29/821976925/coronavirus-cases-soar-across-the-u-s-and-officials-say-worse-is-yet-to-come (the federal government extended social distancing for 30 more days).

[3] Patrice A. Harris, President, Am. Med. Ass'n, *AMA Statement on Government Interference in Reproductive Health Care* (Mar. 30, 2020), https://www.ama-assn.org/press-center/ama-statements/ama-statement-government-interference-reproductive-health-care.

[4] The medical organizations issuing this joint guidance were ACOG, the American Board of Obstetrics & Gynecology, the American Association of Gynecologic Laparoscopists, the American Gynecological & Obstetrical Society, the American Society for Reproductive Medicine, the Society for Academic Specialists in General Obstetrics and

This reasoning is firmly entrenched in law. Absent injunctive relief from this Court, Defendants' application of the Notice would violate decades of U.S. Supreme Court precedent categorically prohibiting states from banning abortion before viability, or imposing burdens on access that exceed the benefits conferred. *See Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2310 (2016); *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846, 871 (1992) (The "central principle" of *Roe v. Wade*, 410 U.S. 113, 166 (1973) is that "[b]efore viability, the State's interests are not strong enough to support a prohibition of abortion."). This is true even when the government is "safeguard[ing] the public health and the public safety" in an emergency; it may not impose a restriction that is "a plain, palpable invasion of rights secured by the fundamental law." *Jacobson v. Massachusetts*, 197 U.S. 11, 30 (1905).

And even if a date limitation for the Notice is provided at some indeterminate point, the COVID-19 pandemic does not reduce the need for abortions; if anything, it makes timely access to comprehensive reproductive healthcare even more urgent, while raising additional obstacles for individuals seeking care. Denial and delay of abortion will impose physical health risks on patients and can cause significant emotional, social, and economic harms. These burdens are exacerbated by the public health emergency and must be borne by Louisiana women seeking abortion, the majority of whom are poor or low income and already face enormous obstacles accessing any healthcare. And significantly, patients who want to end a pregnancy but are unable to do so will require far more contact with Louisiana's healthcare system— including multiple prenatal visits; additional screening tests; and, ultimately, hospital delivery—or they will face increased travel and contacts outside of their communities if they attempt to obtain care in another state. Accordingly, preventing access to abortion would increase the risks, both to patients and the rest of Louisiana's population, of contracting COVID-19 and increase the use of PPE and hospital resources— ***contrary to the stated goals of the Notice and to public health***.

_____

Gynecology, the Society of Family Planning, and the Society for Maternal-Fetal Medicine. *See* Am. Coll. of Obstetricians & Gynecologists et al., *Joint Statement on Abortion Access During the COVID-19 Outbreak* (Mar. 18, 2020), https://www.acog.org/news/news-releases/2020/03/joint-statement-on-abortion-access-during-the-covid-19-outbreak.

Indeed, the AMA and ACOG have recently weighed in to caution that actions like Louisiana's are "likely to *increase*, rather than decrease, burdens on hospitals and use of PPE. At the same time, [they] will severely impair essential health care for women and [] place doctors, nurses, and other medical professionals in an untenable position" by penalizing necessary medical care.[5] Thus, as interpreted by Defendants, the Notice does *nothing* to serve its purported goals, and in fact will undermine those goals while imposing severe burdens on patients. It violates patients' rights to decide whether to continue a pregnancy because "beyond all question," the burdens imposed by the Notice in these circumstances far outweigh any benefits of barring patients from obtaining abortion care. *See In re Abbott*, 2020 WL 1685929, at *12–13 (5th Cir. Apr. 7, 2020).

As is true for healthcare providers across the state, Hope understands it has an important role to play in reducing the spread of COVID-19 and preserving much-needed medical resources while continuing to provide essential healthcare. To that end, Hope is in full compliance with the Notice. It is diligently protecting its patients and staff and has put in place numerous protocols to reduce the spread of the virus. Hope has also instituted additional policies to ensure compliance with the Notice, including making every effort to preserve PPE while minimizing the spread of COVID-19. Hope's provision of reproductive healthcare also does not impact any hospital resources. Defendant Landry's recent unannounced "investigation" of Hope made all of this well-known to Defendants.

Based on Defendants' changed interpretation of the Notice, their publicly-announced intentions and attempts to shutter Hope, and the lack of any expiration date in the Notice, injunctive relief is necessary to halt Defendants from infringing on Louisianans' fundamental constitutional right to abortion prior to viability and to preserve the status quo for patients who are seeking that care. Indeed, ***every federal district court*** reviewing other states' attempts to ban abortion under the guise of COVID-19 has granted

---

[5] Brief of Am. Coll. of Obstetricians & Gynecologists, Am. Med. Ass'n, & Other Nationwide Orgs. of Med. Profs. as Amici Curiae in Opp'n to the Pet. for a Writ of Mandamus at 5, *In re: Abbott*, No. 20-50264 (5th Cir. Apr. 2, 2020).

some emergency relief. This Court should do the same; injunctive relief is warranted here.

## STATEMENT OF FACTS

### I.    Abortion and Reproductive Healthcare in Louisiana.

Legal abortion is a vital, safe, and common form of healthcare,[6] and individuals seek abortion for a multitude of personal and often complex reasons. *See* Ex. E to Pl.'s Mot., Mehta Decl. ¶ 27. Nationally, three-fourths of all abortion patients are low-income,[7] and over 59 percent of patients have already given birth.[8] Abortions very rarely result in complications and do so at rates of no more than a fraction of a percent.[9] Additionally, every pregnancy-related complication is more common among women who continue their pregnancies and have live births than among those who have abortions.[10] In Louisiana, the risk is much higher, and the state has one of the highest maternal mortality rates in the country.[11]

Because pregnancy is not a static condition, abortion is necessarily time-sensitive healthcare. Ex. F to Pl.'s Mot., Pittman Decl. ¶ 11; Mehta Decl. ¶¶ 18, 27. Three abortion clinics serve the nearly one-million women of reproductive age who live in Louisiana, and Hope is the only reproductive healthcare clinic in the Northern region of the state. Pittman Decl. ¶ 1. According to the latest available LDH data,

---

[6] Nat'l Acads. of Sci., Eng'g & Med., *The Safety & Quality of Abortion Care in the United States*, 77 (The National Academies Press 2018) ("The clinical evidence makes clear that legal abortions in the United States—whether by medication, aspiration, D&E, or induction—are safe and effective.") [hereinafter National Academies Report].

[7] Jenna Jerman, Rachel K. Jones, & Tsuyoshi Onda, *Characteristics of Abortion Patients in 2014 and Changes Since 2008*, Guttmacher Inst. at 11 (May 2016), https://www.guttmacher.org/sites/default/files/report_pdf/characteristics-us-abortion-patients-2014.pdf.

[8] *Id.* at 6, 7; *see also* Guttmacher Inst., *Induced Abortions in the United States* 1 (Sept. 2019), https://www.guttmacher.org/sites/default/files/factsheet/fb_induced_abortion.pdf; Tara C. Jatlaoui et al., U.S. Dep't of Health & Human Servs., Ctrs. for Disease Control & Prevention, *Abortion Surveillance — United States, 2016*, 68(11) Surveillance Summaries at 36 (Nov. 29, 2019), https://www.cdc.gov/mmwr/volumes/68/ss/pdfs/ss6811a1-H.pdf.

[9] National Academies Report, *supra* note 6 at 55, 60, 74–75.

[10] Elizabeth G. Raymond & David A. Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119 Am. J. Obstetrics & Gynecology 215, 217 (2012). In fact, the risk of death for those carrying pregnancies to term is approximately 14 times higher than for those obtaining abortions. *Id.*

[11] *See* United Health Found., *America's Health Rankings: Maternal Mortality* (2019), https://www.americashealthrankings.org/explore/health-of-women-and-children/measure/maternal_mortality_a/state/ALL.

over 8,000 abortions took place in the State in 2018.[12] In 2019, Hope provided 3,213 abortions. *Id*. ¶ 6.

Hope provides two safe and effective types of abortion care: medication abortion, up to 8 weeks as measured from the first day of the patient's last menstrual period ("LMP"), and procedural abortion up to 16 weeks, 6 days LMP. *Id.* ¶ 4. Medication abortion involves two medications: mifepristone (usually taken at a clinic) and then misoprostol (usually taken 24 to 48 hours later at a location of their choosing, most often at their home). *Id*. It is not a "surgery or procedure." Mehta Decl. ¶ 29. A procedural abortion is a minimally invasive and brief procedure—typically taking about five minutes in an outpatient setting, like Hope. Pittman Decl. ¶ 4. It typically involves the use of gentle suction through the vaginal canal to empty the uterus.[13] *Id*.

Neither medication nor procedural abortion requires extensive PPE. *Id*. ¶ 10; Mehta Decl. ¶ 29. No PPE is required for the transabdominal ultrasound done prior to the day of the procedure or day the patients are given the pills for medication abortion. Pittman Decl. ¶ 10. For medication abortion, the exam and transvaginal ultrasound usually require a total of one pair of exam gloves per patient; no PPE is needed to provide patients with the pills. *Id.* A procedural abortion requires one pair of exam gloves; one pair of sterile gloves; a simple face mask with elastic loops and gauze covering; as well as washable, not disposable, scrubs; one pair of disposable shoe covers; and a non-disposable face shield at the physician's discretion—all worn throughout the day.[14] Pittman Decl. ¶ 10. Hope does not use respirators or N95 masks—the face protection in shortest supply. *Id.* Hope also uses latex exam gloves when possible, which are not typically used in hospitals. *Id.*

---

[12] La. Bureau of Vital Recs. & Stats., *Induced Termination of Pregnancy by Weeks of Gestation, Race, Age, and Marital Status Reported Occurring in Louisiana, 2018* (2018), http://www.ldh.la.gov/assets/oph/Center-RS/vitalrec/leers/ITOP/ITOP_Reports/Ap18_T21.pdf.

[13] This is also referred to as "surgical" abortion, is not what is commonly understood to be "surgery," as it involves no incision and does not require general anesthesia. *See* National Academies Report, *supra* note 6 at 10, 59, 179.

[14] Gloves are typically needed for any transvaginal ultrasound or laboratory exam but are not required for transabdominal ultrasounds. *See* Pittman Decl. ¶ 10. Per CDC guidance, Hope also provides patients for whom there is a concern for COVID-19 or other upper respiratory disease with a mask. Ctrs. for Disease Control & Prevention, *FAQs about Personal Protective Equipment* (Mar. 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/respirator-use-faq.html.

## II.    COVID-19 Pandemic and LDH's Notice.

On March 11, 2020, Governor John Bel Edwards declared "a statewide public health emergency."[15] On March 21, LDH issued the Notice, which had immediate effect, directing all healthcare facilities and all physicians "that any and all medical and surgical procedures SHALL be postponed until further notice," subject to two exceptions. Notice, § I(A) (emphasis in original). The Notice exempted procedures to treat an "emergency medical condition" or to "avoid further harms from underlying condition or disease." *Id.* § I(B)(ii).

With respect to healthcare services other than medical and surgical procedures, the Notice directs all healthcare providers to transition in-person healthcare services "to a telehealth mode of delivery, when medically appropriate and when the same standard of care can be met as an in-person visit." *Id.* § II(A). Providers are to make a good faith determination on a case-by-case basis as to the appropriateness of telehealth. *Id.* Further, the Notice directs that "all healthcare providers postpone all in-person healthcare services that can safely be postponed for 30 days." *Id.* § II(B). In making this determination, providers shall act in "good faith;" "shall use their best medical judgment within the scope of their license;" and "consider the entire clinical picture, including the consequences to the patient of postponement and the consequences to the healthcare system." *Id.*

## III.    Hope's Health & Safety Measures in Response to COVID-19, and Compliance with the Notice.

Since the COVID-19 crisis began, Hope has been diligent in protecting the health of its patients and staff while providing its patients access to high-quality, timely abortion care. Pittman Decl. ¶¶ 14–24. It has promptly put in place numerous protocols to reduce the spread of COVID-19, while continuing to comply with all relevant Louisiana laws and regulations governing abortion. *Id.* After becoming aware of the Notice, on the next business day, Hope took immediate steps to adopt additional measures to comply

---

[15] Office of the Gov., Louisiana Proclamation No 25 JBE 2020 – Public Health Emergency – Covid-19 (updated Mar. 22, 2020), https://gov.louisiana.gov/assets/ExecutiveOrders/25-JBE-2020-COVID-19.pdf.

with LDH directives, including, but not limited to, a written policy for the provider to medically verify whether each patient could postpone their abortion; training staff on the Notice and this policy; for each patient, documenting that the policy was followed, and that (1) for procedural abortion patients, the physician determines that they cannot postpone care and makes a medical determination that they fell under the exceptions in Section I of the Notice and (2) for medication abortion patients, the physician, after "consider[ing] the entire clinical picture" "exercised their best medical judgment within the scope of their license" to determine whether the healthcare service should be provided. *Id.* ¶ 18. Hope is also following recommendations and guidelines published by the Centers for Disease Control and Prevention ("CDC"), National Abortion Federation, the Centers for Medicare and Medicaid Services, the AMA, and ACOG regarding COVID-19. *Id.*

In accordance with these recommendations, Hope's staff screens patients for symptoms over the telephone when scheduling appointments and screens them again upon arrival to the clinic. *Id.* ¶ 19. Upon arrival at the clinic, the temperature of each person, including patients and staff, is checked. *Id.* ¶ 20. Any person exhibiting a fever or other symptoms of COVID-19 is not permitted to remain at the clinic. *Id.* Hope's staff also maintains social distancing by staggering appointments, asking patients to wait outside the clinic until their appointment, not allowing patients to bring a support person to their appointment, keeping patients in separate rooms whenever possible, using procedure and recovery rooms as waiting rooms on counseling-only days, and spacing patients a minimum of six feet apart during their time in the clinic. *Id.* ¶ 21. The result is that the clinic only has six patients wait in its largest waiting room to maintain social distancing, compared to thirty patients prior to the COVID-19 pandemic. *Id.* In deference to the need for more space, Hope has changed its schedule such that no counseling and procedures happen on the same day—even though initial consults are booked into May—which has meant that available consultation days were cut from six to three days per week. *Id.* At any given time, Hope has fewer patients inside the clinic than it normally had before the COVID-19 pandemic. *Id.* Hope has also reduced the

number of staff in the clinic at any given time and has restricted the staff who can be present in the procedure room during procedural abortion to only those that are medically essential or required by law. *Id.* ¶ 23. In these ways, Hope is conserving PPE by minimizing unnecessary in-person contacts with patients, but continues to use PPE to safely provide services. Additionally, Hope's staff consistently, frequently, and repeatedly disinfect surfaces, doorknobs, and other frequently touched surfaces throughout the day. *Id.* ¶ 22. Hope uses no hospital resources as it provides no inpatient care, and Hope has made every effort to conserve PPE, balancing providing essential healthcare to patients while minimizing the possibility of spread of COVID-19. *Id.* ¶ 24.

IV.    **Defendants' Threat to End Abortion Access Unrelated to Any Valid Public Health Justification and Harms to Patients.**

On March 23, 2020, Hope, through counsel, wrote to Defendants Russo and Guidry, requesting written confirmation from LDH that abortion care is permitted under the Notice.[16] The Solicitor General responded on March 27, stating "that the order speaks for itself. It applies to all professional licensees and all licensed health care facilities."[17]

The next day, on Saturday, March 28, Defendant Landry took affirmative steps to close abortion clinics in Louisiana and relayed to news outlets that Hope's March 23 letter was "clearly indicating their intent to defy the order and not delay procedures"[18]—despite plain language in the letter to the contrary. Defendant Landry also issued a press release urging LDH to adopt an interpretation that "elective

---

[16] Ex. B to Compl., Letter from Jenny Ma, Senior Staff Attorney, Ctr. for Reprod. Rights, to Stephen Russo, Interim Sec'y & Exec. Counsel, La. Dep't of Health, & Jimmy Guidry, M.D., State Health Officer, La. Dep't of Health (Mar. 23, 2020), ECF No. 1-8.

[17] Ex. C to Compl., Email from Elizabeth Murrill, Solicitor Gen., La., to Jenny Ma, Senior Staff Attorney, Ctr. for Reprod. Rights (Mar. 27, 2020), ECF No. 1-9.

[18] *AG Landry Calls on LDH to Enforce Emergency Order Against Shreveport Abortion Clinic*, (Mar. 28, 2020), https://www.arklatexhomepage.com/news/local-news/louisiana-ag-calls-on-ldh-to-investigate-reports-shreveport-womens-clinic-is-violating-emergency-order/.

abortions are not essential procedures" and to "enforce the [Notice] fully" under that interpretation.[19]

Defendants confirmed this intent when on April 9, approximately three weeks after the Notice issued, two

individuals from Defendant Landry's office, specifically the Criminal Division of the Louisiana

Department of Justice's Medicaid Fraud Control Unit—Charles Roark, an Investigator, and Michael

Calloway, a Special Agent—made an unannounced visit to Hope.[20] These individuals represented that

they were working with LDH but provided no written documentation explaining their relationship to

LDH. Pittman Decl. ¶ 27. Over several hours, they asked about Hope's practices—such as its use of PPE,

its disinfection practices, social distancing measures, and the number of medical procedures and

healthcare visits Hope is performing. *Id*. They also asked to review the confidential medical charts of

twenty randomly-selected patients and demanded Hope produce copies of these patient charts on Monday,

April 13.[21] *Id*. On April 13 before 1:30pm CDT, the Attorney General's office sent an email and made

multiple calls to the clinic regarding copies of the patient charts. *Id*.

Despite Hope's compliance with the Notice, Defendants now seek to apply it to halt abortion care

in Louisiana indefinitely. Because the Notice provides no time limitation on the requirements in Section

I, all patients currently seeking procedural abortion will be denied access to abortion altogether or delayed

until such time as LDH lifts the Notice. Notice, § I(A). As to Section II, it is unlawful for Hope, unlike

---

[19] Jeff Landry, La. Attorney General, *Shreveport Abortion Clinic Ignoring Health Directive, Further Jeopardizing Public Safety* (Mar. 28, 2020), https://www.ag.state.la.us/Article/9747. Defendant Landry also retweeted from his official account that he was "taking steps today to close abortion clinics during #coronavirus classic #lagov #lalege." Attorney General Jeffrey Landry, Twitter (Apr. 9, 4:42 PM CT), https://twitter.com/JeffLandry/status/1248365602378584067.

[20] Inspectors also made an unannounced visit at another abortion clinic, Delta Clinic in Baton Rouge, on the same day. Greg Hilburn, *COVID-19: Louisiana Governor, Attorney General Taking Steps to Close Abortion Clinics*, Monroe News-Star, (Apr. 9, 2020), https://www.thenewsstar.com/story/news/2020/04/09/covid-19-louisiana-governortaking-steps-close-abortion-clinics/5121754002/.

[21] In light of the unprecedented request for patient charts by non-medical professionals from the Attorney General's Office and the highly confidential nature of their contents, counsel for Hope wrote to Kimberley Humbles, LDH's general counsel, seeking the purpose of the inspection; the role of individuals from the Attorney General's office in inspecting licensed health care facilities; the authority for the request for confidential patient medical charts by these individuals; and the names of all individuals to whom the information in these confidential patient charts would be disclosed. Ex. D to Compl., Letter from Jenny Ma, Senior Staff Attorney, Ctr. for Reprod. Rights, to Kimberly Humbles, Gen. Counsel, La. Dep't of Health (Apr. 13, 2020), ECF No. 1-10. No response has been received to date.

other healthcare providers, to transition its services to telehealth because separate, medically unnecessary abortion-specific laws require that numerous aspects of abortion care be provided in person.[22] Because these medically unnecessary requirements all mandate that a patient visit the clinic in person, Hope is unable to offer counseling or medication abortion remotely, as the Notice instructs other providers to do.[23] *See* Pittman Decl. ¶ 26.

Defendants' application of the Notice therefore operates as an effective ban on previability abortion—in direct conflict with medical and public health guidance, Mehta Decl. ¶¶ 27, 30—and singles out abortion. As ACOG and other leading medical organizations recently emphasized in a joint statement, "Abortion Access During the COVID-19 Outbreak," abortion is an essential procedure that cannot be delayed.[24] The statement stresses that: "To the extent that hospital systems or ambulatory surgical facilities are categorizing procedures that can be delayed during the COVID-19 pandemic, abortion should not be categorized as such a procedure" because it "is an essential component of comprehensive health care" and "a time-sensitive service for which a delay of several weeks, or in some cases days, may increase the risks [to patients] or potentially make it completely inaccessible."[25] Additional guidance from ACOG indicates that pregnant women should be considered an at-risk population for COVID-19 because, as ACOG and

---

[22] State law requires that certain state-mandated information be provided to the patient at least 24 hours "orally and in person." La. Rev. Stat. § 40:1061.17. Louisiana prohibits the use of telehealth for medication abortion, by requiring that when a medication is used "for the purpose of inducing an abortion," the prescribing physician must be in the same room and in the physical presence of the patient. La. Admin. Code tit. 48, § 4433; La. Rev. Stat. § 40:1061.11. Louisiana also requires a patient to obtain an ultrasound at least 24 hours before the abortion, La. Rev. Stat. § 40:1061.10; undergo multiple methods to verify a pregnancy, in contravention of the standard of care; a vaginal examination, whether or not it is recommended by the provider, and laboratory tests that are not always necessary, La. Admin. Code tit. 48, § 4431.

[23] The U.S. Department of Health and Human Services has also recognized the importance of telehealth during the COVID-19 crisis. *See* Off. of Civil Rights, U.S. Dep't of Health & Human Servs., *OCR Announces Notification of Enforcement Discretion for Telehealth Remote Communications During the COVID-19 Nationwide Public Health Emergency*, (Mar. 17, 2020), https://www.hhs.gov/about/news/2020/03/17/ocr-announces-notification-of-enforcement-discretion-for-telehealth-remote-communications-during-the-covid-19.html. In addition, the Centers for Medicare and Medicaid Services have announced a temporary expansion of Medicare telehealth benefits. Ctrs. for Medicare & Medicaid Servs., *Medicare Telemedicine Health Care Provider Fact Sheet* (Mar. 17, 2020), https://www.cms.gov/newsroom/fact-sheets/medicare-telemedicine-health-care-provider-fact-sheet?inf_contact_key=255903cd45b988193a87d7bff084d88f.

[24] Am. Coll. of Obstetricians & Gynecologists et al., *Joint Statement on Abortion Access During the COVID-19 Outbreak*, *supra* note 4.

[25] *Id.*

the CDC have explained, pregnant people experience immunologic and physiologic changes that may increase their susceptibility to viral respiratory infections.[26] And the AMA emphasized that physicians and patients, not the government, "should be the ones deciding" which medical services "need to be performed, and which ones can wait."[27]

Even if the Notice is lifted at some point in the future—in weeks, or more perhaps months—delaying or denying access to safe, needed, and time-sensitive medical care can endanger Louisianans' health. *See* Pittman Decl. ¶¶ 27–28, 32–35; Mehta Decl. ¶¶ 27–33. Pregnancy is not a static condition. Mehta Decl. ¶ 12. Denying or delaying abortion care forces patients to remain pregnant, subject to pregnancy symptoms and pregnancy risks. *Id.* ¶ 27. Although abortion is extremely safe throughout pregnancy, complication rates increase with gestational age. Pittman Decl. ¶ 32. Delaying abortion care will increase unnecessary health risks for Hope's patients and can increase anxiety and suffering for many women. *Id.*; *see also id.* ¶¶ 16–17; Mehta Decl. ¶¶ 32–33. Delay can also increase the costs of abortion care itself, as well as the costs of travel, childcare, and taking time off work, among other things. Pittman Decl. ¶¶ 13, 16–17, 31. These burdens hit poor Louisianans, who make up a majority of Hope's patients, the hardest. *Id.* ¶ 35. At Hope, patients delayed beyond 8 weeks LMP will be unable to access medication abortion, and patients delayed beyond 16 weeks, 6 days LMP will be unable to obtain an abortion at Hope altogether. *Id.* ¶¶ 33–38. Other patients may be delayed past the point at which abortion is available. *Id.* ¶ 38. This is exacerbated by the current weeks-long-wait for a consult visit at Hope to adhere to social distancing and other COVID-19-mitigating directives. *Id.* ¶ 37.

The COVID-19 public health emergency adds further burdens on Hope's patients. It has limited public transit, caused layoffs and other work disruptions, shuttered schools and childcare facilities, and

---

[26] Am. Coll. of Obstetricians & Gynecologists, *Novel Coronavirus (COVID-19) Practice Bulletin*, https://www.acog.org/clinical/clinical-guidance/practice-advisory/articles/2020/03/novel-coronavirus-2019 (last updated Mar. 13, 2020); *see also* Ctrs. for Disease Control & Prevention, *Pregnancy and Breastfeeding*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/pregnant-women-faq.html (last updated Apr. 3, 2020).

[27] *Id.*

otherwise limited patients' options for transportation and childcare support during a time of recommended social distancing.[28] Indeed, during the week ending on April 4, 2020, unemployment claims in Louisiana rose to 102,985 initial claims—a 100,730 increase from the 2,255 initial claims filed three weeks prior.[29]

Louisianans who are unable to obtain an abortion at a clinic may attempt to travel to another state (even as the pandemic proves to make travel in and out of the state increasingly difficult),[30] Mehta Decl. ¶¶ 32–33, or seek care outside of a clinical setting, which is risky and can lead patients to seek emergency care, Pittman Decl. ¶¶ 28–29. They may be forced to carry their pregnancies to term, which will require far more contacts with the healthcare system, including multiple prenatal visits; pregnancy-related screenings and tests, including repeat ultrasounds and blood tests at a minimum; and ultimately childbirth—all of which will require far more PPE and hospital staffing, equipment, and bed capacity than abortion care, Mehta Decl. ¶¶ 11–24, 28–31; *see also* Pittman Decl. ¶¶ 11, 38.[31] This is contrary to the

---

[28] *See, e.g.*, La. Proclamation No. 33, JBE 2020, *Additional Measures for COVID-19 Stay at Home*, (Mar. 22, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/JBE-33-2020.pdf; La. Proclamation No. JBE 2020 – 27, *Additional Measures for COVID-19 Public Health Emergency* (Mar. 13, 2020), https://www.louisianabelieves.com/docs/default-source/louisiana-believes/27-jbe-2020-covid-19.pdf?sfvrsn=4dfd9b1f_2; *COVID-19 Impact: More than 65,000 Hotel Industry Jobs Lost in Louisiana, Report Says*, WDSU Digital Team (Mar. 20, 2020), https://www.wdsu.com/article/covid-19-impact-more-than-65000-hotel-industry-jobs-lost-in-louisiana-report-says/31817733; *see also* White House, *The President's Coronavirus Guidelines for America* (Mar. 16, 2020), https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf; Rebecca Shabad, *Fauci Predicts Americans Will Likely Need to Stay Home for at Least Several More Weeks*, NBC News (Mar. 20, 2020) https://www.nbcnews.com/politics/donald-trump/fauci-predicts-americans-will-likely-need-stay-home-least-several-n1164701.

[29] *Compare* U.S. Dep't of Labor, *Unemployment Insurance Weekly Claims Report / USDL 20-510-NAT* at 5 (Apr. 9, 2020), https://www.dol.gov/ui/data.pdf *with* U.S. Dep't of Labor, Unemployment Insurance Weekly Claims Report / USDL 20-510-NAT at 5 (Mar. 26, 2020), https://oui.doleta.gov/press/2020/032620.pdf.; *see also* Timothy Boone, *Louisiana unemployment claims triple. Here's how you can file a claim*, The Advocate (Mar. 17, 2020), https://www.theadvocate.com/baton_rouge/news/coronavirus/article_97d5ad50-6890-11ea-9aa6-abc044ca268c.html.

[30] Jeremy Blackman, *Travel from Louisiana Further Tightened by New Checkpoints*, Houston Chronicle (Apr. 5, 2020), https://www.houstonchronicle.com/news/houston-texas/houston/article/Travel-from-Louisiana-further-tightened-by-new-15180553.php; *see also* State of Texas, *Form for Arrivals from Areas Designated for Mandatory Self-Quarantine* (last visited Apr. 13, 2020), https://www.dps.texas.gov/covidtravel/groundTravel.pdf; Greg Abbott, Governor, Tex., Exec. Order GA-12 (Mar. 29, 2020), https://gov.texas.gov/uploads/files/press/EO-GA-12_roadway_quarantine_for_COVID-19_IMAGE_03-29-2020.pdf (imposing 14-day self-quarantine on people entering Texas "through roadways from Louisiana").

[31] *See also* Rupsa C. Boelig et al., *Expert Review: MFM Guidance for COVID-19*, Am. J. Obstetrics & Gynecology MFM (Mar. 19, 2020) (recommending that, even during the COVID-19 pandemic, pregnant people should have multiple in-person visits for routine ultrasounds and laboratory work throughout pregnancy).

stated goals of the Notice and to public health.

Absent immediate relief from the Court, Defendants' application of the Notice to abortion will force Hope to turn away patients seeking abortion care. Pittman Decl. ¶¶ 25–27. Without Hope, all patients will be denied or delayed in accessing abortion. *Id.* ¶¶ 33–38. As a result, patients will be forced to carry their pregnancies to term, resulting in a deprivation of their fundamental right to determine if, when, and how to have a child or add to their existing families, as well as greater health and other risks to themselves and their families. *Id.; see also id.* ¶ 40. Targeting abortion will do nothing to advance the purported goals of the Notice—and in fact, undermines them. This may not be the Notice's intent, but, because of Defendants' interpretation and threatened enforcement, it is its effect.

## ARGUMENT

Injunctive relief is proper when a plaintiff establishes (1) a substantial likelihood of success on the merits; (2) substantial threat of irreparable injury; (3) that the injury to them outweighs any harm the injunction might cause Defendants; and, (4) granting the injunction will not disserve the public interest. *See, e.g.*, *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014). Each factor weighs heavily in Hope's favor here to grant Hope the injunctive relief it seeks.

Hope is likely to succeed on the merits of its claim. The Notice, as applied by Defendants to abortion care, directly contravenes decades of binding Supreme Court precedent holding that a state may not ban abortion before viability. This is true even in a pandemic where the state may exercise its authority to "safeguard the public" but must carefully guard against "unreasonable," "arbitrary," or "oppressive" exercises of it. *Jacobson*, 197 U.S. at 27, 38. The Notice, as interpreted by Defendants, is antithetical to the public health and only undermines its explicit goals, while inflicting severe and irreparable harm on Hope's patients by increasing risks to their health and violating their constitutional rights. It is "beyond question" that the Notice directly contravenes decades of binding Supreme Court precedent holding that a state may not ban abortion before viability, or severely restrict it without showing that the restriction's

14

benefits outweigh its burdens. *See In re Abbott*, 2020 WL 1685929 at *9 (citing *Jacobson*, 197 U.S. at 31). The balance of hardships weighs decisively in Hope's favor, and the public interest would be served by the relief Hope seeks. This Court should grant injunctive relief and join every other federal district court that has enjoined measures restricting abortion during the COVID-19 pandemic.[32]

### I.     Hope Has a Substantial Likelihood of Success on the Merits of its Claims.

Even in times of crisis, fundamental rights secured by the U.S. Constitution remain steadfast, *see Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 120–21 (1866), and precedent from *Jacobson* to *Casey*, establishes that the State cannot ban previability abortion or severely restrict it without justification during a pandemic.[33] While the government has authority to "safeguard the public health and the public safety" in an emergency, the State may not—even while exercising that power—impose a restriction that is "a plain, palpable invasion of rights secured by the fundamental law." *Jacobson*, 197 U.S. at 25, 31.

The Notice, as interpreted by Defendants, would act as a complete denial of abortion access, and is therefore a "plain, palpable invasion" of that fundamental right in contravention of *Jacobson* and *Casey*. A state's restriction on abortion is unconstitutional unless it "confers medical benefits sufficient to justify the burdens upon [abortion] access" that it imposes. *Whole Woman's Health*, 136 S. Ct. at 2300; *see also*

---

[32] *See Robinson v. Marshall*, No. 2:19-cv-365 (M.D. Ala. Apr. 12, 2020); *Planned Parenthood Ctr. for Choice v. Abbott*, No. A-20-CV-323-LY, slip op. (W.D. Tex. Apr. 9, 2020), *stayed by In re: Abbott*, No. 20-50296 (5th Cir. Apr. 10, 2020), *amended by* No. 20-50296 (5th Cir. Apr. 13, 2020); *S. Wind Women's Ctr. v. Stitt*, 2020 WL 1677094 (W.D. Okla. Apr. 6, 2020), *appeal dismissed*, No. 20-6045 (10th Cir. Apr. 13, 2020); *Robinson*, 2020 WL 1520243 (M.D. Ala. Mar. 30, 2020), *amended by* 2020 WL 1659700 (M.D. Ala. Apr. 3, 2020); *Pre-Term Cleveland v. Attorney Gen. of Ohio*, No. 1:19-cv-00360 (S.D. Ohio Mar. 30, 2020), *aff'd*, No. 20-3365, 2020 WL 1673310 (6th Cir. Apr. 6, 2020); *see also Planned Parenthood Ctr. for Choice*, 2020 WL 1502102 (W.D. Tex. Mar. 30, 2020), *vacated*, *in In re: Abbott* No. 20-50264, slip op., 2020 WL 1685929 (5th Cir. Apr. 7, 2020).

[33] As this court well knows, in the years since *Casey*, federal courts of appeals have uniformly struck down previability bans on abortion as incompatible with *Roe* and *Casey*, and the Supreme Court has consistently declined to grant certiorari to reconsider the issue. *See, e.g.*, *MKB Mgmt. Corp.* v. *Stenehjem*, 795 F.3d 768, 772-773 (8th Cir. 2015) (six-week ban), *cert. denied*, 136 S. Ct. 981 (2016); *Edwards* v. *Beck*, 786 F.3d 1113, 1117–19 (8th Cir. 2015) (per curiam) (twelve-week ban), *cert. denied*, 136 S. Ct. 895 (2016); *Isaacson* v. *Horne*, 716 F.3d 1213, 1217, 1231 (9th Cir. 2013) (20-week ban), *cert. denied*, 571 U.S. 1127 (2014); *Jane L.* v. *Bangerter*, 102 F.3d 1112, 1117–18 (10th Cir. 1996) (22-week ban), *cert. denied*, 520 U.S. 1274 (1997); *Sojourner T.* v. *Edwards*, 974 F.2d 27, 29, 31 (5th Cir. 1992) (ban on all abortions with exceptions), *cert. denied*, 507 U.S. 972 (1993); *Guam Soc'y of Obstetricians & Gynecologists* v. *Ada*, 962 F.2d 1366, 1368–69, 1371–72 (9th Cir. 1992) (ban on all abortions with exceptions), *cert. denied*, 506 U.S. 1011 (1992).

*id.* at 2309 ("The rule announced in Casey, . . . requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer."). Just last week, the Fifth Circuit explained that the analysis of *Jacobson* in the abortion context must evaluate whether the measures "impose[] burdens on abortion that 'beyond question' exceed its benefits in combating the epidemic." *In re: Abbott*, 2020 WL 1685929, at *11 (per curiam) (internal citations omitted); *see also id.* at *8–11 (contemplating that an "outright ban" would violate *Jacobson*). The Fifth Circuit continued that this analysis requires "careful parsing of the evidence," to confirm that the measures have "at least some real or substantial relation to the public health crisis." *Id.* at *11, *7 (internal citations and quotations omitted). In so doing, a court must examine whether a state's emergency measures "are pretextual—that is, arbitrary or oppressive," and carefully guard against "unreasonable," "arbitrary," or "oppressive" exercises of state power. *Id.* at *6–7, *19; *see also Jacobson*, 197 U.S. at 31 (police power is improperly used when "the means prescribed by the state . . . has no real or substantial relation to the protection of the public health and the public safety.").

        As interpreted by Defendants, the Notice is an absolute and insurmountable obstacle for every abortion patient. Regardless of whether the Notice operates as a complete ban on previability abortion, or a temporary one, under the balancing test set out in *In re Abbott*, it is "'beyond question' [that the Notice's] burdens outweigh its benefits" as applied to patients seeking abortion. *See In re Abbott*, 2020 WL 1685929 at *9 (citing *Whole Woman's Health*, 136 S. Ct. at 2309). The Notice is effective for an unknown duration, but tied to the pandemic, which is expected to last many months.[34]

        Additionally, even if some patients currently seeking abortion still fall within the legal limit when the Notice is lifted, and are able to obtain an abortion then, delaying abortions by weeks or months creates substantial burdens. *See Robinson*, 2020 WL 1520243, at *2 (recognizing that a "delay in obtaining an

---

[34] Denise Grady, *Not His First Epidemic: Dr. Anthony Fauci Sticks to the Facts*, N.Y. Times, Mar. 8, 2020, https://www.nytimes.com/2020/03/08/health/fauci-coronavirus.html.

abortion can result in the progression of a pregnancy to a stage at which an abortion would be less safe, and eventually illegal" (quoting *Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786, 796 (7th Cir. 2013)). Delay will bar some patients from accessing the method of abortion that is best for them. *See, e.g.*, *Planned Parenthood of Wisc., Inc. v. Schimel*, 806 F.3d 908, 918 (7th Cir. 2015). Patients delayed beyond 8 weeks LMP will be unable to access medication abortion at Hope. Pittman Decl. ¶ 33. Patients delayed beyond 16 weeks, 6 days LMP will be unable to access an abortion at Hope altogether. *Id.* ¶ 38.

Although abortion is extremely safe throughout pregnancy, complication rates increase with gestational age. *Id.* ¶ 32. Delaying abortion care unnecessarily increases health risks, and increases anxiety and suffering for many women. *Id.*; *see also id.* ¶¶ 16–17. Delay can also increase the cost of abortion care, as well as the costs of travel, childcare, and taking time off work. *See, e.g.*, *Whole Woman's Health*, 136 S. Ct. at 2314–18; *Schimel*, 806 F.3d at 919; *McCormack v. Hiedeman*, 694 F.3d 1004, 1016–17 (9th Cir. 2012); *Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1330, 1356–60 (M.D. Ala. 2014). These burdens are exacerbated for poor and low-income Louisianans. Pittman Decl. ¶ 35. This public health emergency multiplies these burdens, leaving many out of work, with children neither in school nor in childcare, and with restricted access to travel and support people who they might otherwise rely on for transport or childcare.

These burdens vastly outweigh any potential benefits from applying the Notice to abortion, and it is "beyond question" that these burdens exceed any benefits in combatting COVID-19 in Louisiana. On its face, the Notice is intended to serve two purposes: "to utilize hospital staffing, equipment, and bed capacity for the transition to the COVID-19 emergency" and "to preserve Personal Protective Equipment (PPE)." Notice, § I. Hope absolutely shares those interests, but shutting down abortion clinics does nothing to serve those purported interests.

In fact, Defendants' application of the Notice would provide no benefit—it is more likely to aggravate than alleviate the current public health crisis. As to the first interest, legal abortion is safe, and

17

complications associated with abortion, including those requiring hospital care, are exceedingly rare. *Whole Woman's Health*, 136 S. Ct. at 2311–12, 2315. Nearly all abortions in Louisiana are provided in outpatient facilities, such as Hope—not inpatient care facilities or hospitals. Hope's provision of abortion does not deplete any hospital resources—no hospital staffing, equipment, or bed capacity is being diverted away from the fight against COVID-19. *See* Pittman Decl. ¶¶ 10, 24.

As to the second stated interest—to preserve PPE, Hope had already taken several steps to preserve PPE while still taking protective action to prevent the spread of COVID-19, including by limiting the already small number of individuals allowed in procedure rooms, conducting patient follow-up appointments by phone, encouraging (where medically appropriate) medication abortion, and postponing other in-person, non-essential visits that may require PPE. *Id*. ¶¶ 15, 23–24. Moreover, Hope does not use N95 masks or have respirators on its premises—the PPE in greatest need and shortest supply in responding to the COVID-19 pandemic.[35] Hope also utilizes latex exam gloves whenever possible—which hospitals do not normally use. Pittman Decl. ¶ 10. And because pregnancy is not a static condition and requires individualized care at varied intervals throughout, a patient necessarily *must* come into contact with the healthcare system in some way—which necessarily includes use of the same amount, if not more, PPE, particularly for patients forced to carry to term. Mehta Decl. ¶¶ 12–24, 28–31. Under current medical guidelines, even during the pandemic, pregnant patients carrying to term are advised to make multiple trips to healthcare facilities, each requiring PPE, to obtain prenatal care, pregnancy screening, and, ultimately, childbirth. *Id.* All of these encounters require interactions with healthcare providers, and many involve the use of PPE and hospital space.[36] *Id.* Accordingly, Defendants' application of the Notice to

---

[35] *See* Terry Nguyen, *Health Care Workers are Running Out of Face Masks. They're Asking People to Donate*, Vox (Mar. 20, 2020), https://www.vox.com/the-goods/2020/3/20/21188369/face-masks-short-supply-coronavirus-donations; Lena H. Sun, *Face Mask Shortage Prompts CDC to Loosen Coronavirus Guidance*, The Wash. Post (Mar. 10, 2020), https://www.washingtonpost.com/health/2020/03/10/face-mask-shortage-prompts-cdc-loosen-coronavirus-guidance/.
[36] *See also, e.g.*, Rupsa C. Boeling, et al., *MFM Guidance for COVID-19*, Am. J. of Obstetrics & Gynecology (*available online* Mar. 19, 2020), https://www.sciencedirect.com/science/article/pii/S2589933320300367 (recommending reduced

abortion does nothing to preserve PPE (and serves not even a marginal benefit of less use of PPE in the short term) needed to cope with the COVID-19 pandemic.

Further, Hope has taken expansive steps to minimize in-person encounters and further preserve PPE, but Louisiana law restricts their ability to do more. Indeed, separate laws that require all abortions in Louisiana to be provided in-person prevent Hope from following the Notice's direction that all healthcare providers transition in-person healthcare services "to a telehealth mode of delivery." Notice, § II(A). There can be no benefit to prohibit the provision of medication abortion—and only medication abortion—via telehealth, especially during a public health emergency during which the State has directed all healthcare providers to transition in-person visits to telehealth.

In sum, Hope is likely to succeed on the merits because enforcement of the Notice has the effect of placing a complete and insurmountable obstacle in the path of patients seeking previability abortion care in Louisiana. Further, restricting abortion access has no real or substantial relation to the protection of the public health and the public safety and is therefore impermissible, even during a public health crisis such as the COVID-19 pandemic. Defendants' application of the Notice to abortion does not actually advance their asserted interests of preserving PPE and hospital resources; it undermines, rather than serves, public health. Mehta Decl. ¶¶ 11–24, 28–31. It is "beyond question, in palpable conflict with the Constitution." *Jacobson*, 197 U.S. at 31.

Hope is separately likely to succeed on this claim because application of the Notice, as interpreted by Defendants, is pretextual and thus "arbitrary and oppressive." *In re Abbott*, 2020 WL 1685929, at *6 (quoting *Jacobson*, 197 U.S. at 38)*. Defendants received Hope's March 23 Letter—the first business day after the Notice issued. For three weeks, Defendants were aware that Hope was complying with the Notice. Defendant Landry's public statements and April 9 actions, however, lay bare his intent to use the

---

prenatal visits and increased use of telemedicine where possible, but providing that certain in-person visits, such as ultrasound and lab work, are necessary).

COVID-19 public health emergency to shutter abortion clinics, reiterating the "pretextual," "arbitrary," and "oppressive" nature of Defendants untethered enforcement to any state goals of preventing the depletion of PPE or hospital capacity. *See supra* at 9–14.

Additionally, for Hope's patients who would be beyond 16.6 weeks LMP when the Notice expires (even assuming there is a date certain for expiration—which there is not), that delay results in a complete ban on previability abortion in all of Northern Louisiana, and thus constitutes a "plain, palpable invasion" of that fundamental right. *In re Abbott*, 2020 WL 1685929, at *6 (quoting *Jacobson*, 197 U.S. at 31); *id*. at *9–10 (contemplating that an "outright ban" would violate *Jacobson*); *Casey*, 505 U.S. at 846 (stating "[b]efore viability, the State's interests are not strong enough to support a prohibition of abortion"); *id.* at 871, 879 (asserting that "[r]egardless of whether exceptions are made for particular circumstances, a State may not prohibit *any woman* from making the ultimate decision to terminate her pregnancy before viability"). Because Louisiana prohibits abortion after 22 weeks LMP, if the Notice is in effect for four months (approximately 17 weeks) or longer, it will ban abortion *for every single pregnant* patient seeking an abortion in the state right now because most patients do not know they are pregnant until they are at least 6 weeks LMP. Pittman Decl. ¶ 6. For Hope's patients, this would be true if the Notice was in effect for just three months (approximately 13 weeks). Even if the Notice is lifted in two months, patients who are currently only 13 weeks LMP pregnant and seeking an abortion will be unable to do so in the state.

The Fifth Circuit has consistently applied this long-standing, controlling precedent holding that states may not enact measures that ban all or nearly all previability abortions, including twice in just the last six months. *See, e.g.*, *Jackson Women's Health Org. v. Dobbs*, 951 F.3d 246, 248 (5th Cir. 2020) (per curiam) (striking a ban on abortions after six weeks); *Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265, 268–69 (5th Cir. 2019) (enjoining a ban on abortions after fifteen weeks).[37]

---

[37] *See supra* note 15 (listing cases rejecting attempts to ban abortion prior to viability); *see also Carhart v. Stenberg*, 192 F.3d 1142, 1151 (8th Cir. 1999) (striking down ban on "the most common procedure" used to perform abortions after 13

For nearly five decades, the U.S. Supreme Court has held that the Due Process Clause of the Fourteenth Amendment protects a woman's right to choose abortion, *Roe*, 410 U.S. at 153–54, and prior to viability, a state has *no interest* sufficient to justify a ban on abortion, *id*. at 163–65. The Fifth Circuit has strictly adhered to this long-standing core holding: "The [Supreme] Court held that before viability, a State's interests are not strong enough to support a prohibition of abortion." *Sojourner T.*, 974 F.2d at 30 (citing *Casey*, 505 U.S. at 845). This precedent controls even in a pandemic, and Hope has established that it will succeed on the merits of its claim that Defendants' application of the Notice to previability abortion violates their patients' substantive due process rights.

Lastly, Plaintiff has a substantial likelihood of success on their Fourth Amendment claim. Courts have held warrantless searches of abortion clinics unconstitutional under the Fourth Amendment. *See, e.g.*, *Tucson Women's Clinic v. Eden*, 379 F.3d 531, 549–51 (9th Cir. 2004); *Margaret S. v. Edwards*, 488 F. Supp. 181, 214–17 (E.D. La. 1980); *see also June Med. Servs., LLC v. Gee*, 306 F. Supp. 3d 886, 896–97 (M.D. La. 2018) (denying motion to dismiss Fourth Amendment challenge to warrantless inspections). Although "voluntary consent" constitutes a valid exception to the Fourth Amendment's warrant requirement, the government "has the burden of proving that the consent was, in fact, freely and voluntarily given" considering a factual determination of "the totality of the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 222, 227 (1973).

First, representatives from Defendant Landry's office entered Hope without prior notice and without a warrant. Pittman Decl. ¶ 27. Staff credibly believed that they could not refuse entry to these representatives without negatively impacting the clinic or themselves in some way. *Id.* Such conduct does not constitute voluntary, valid consent. *See, e.g.*, *United States v. Guess*, 756 F. Supp. 2d 730, 747 (E.D.

---

weeks), *aff'd*, 530 U.S. 914, 922 (2000); *Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 201 (6th Cir. 1997) (same), *cert. denied*, 523 U.S. 1036 (1998); *Planned Parenthood, Sioux Falls Clinic v. Miller*, 63 F.3d 1452, 1465 (8th Cir. 1995) (holding restriction was an unconstitutional "substantial obstacle" because measure would unconstitutionally chill physicians' willingness to provide abortions), *cert. denied*, 517 U.S. 1174 (1996).

Va. 2010) ("If consent is to be truly voluntary, a defendant must have the option to either grant consent, or . . . refuse to allow the search with no negative . . .impact."); *see also Anobile v. Pelligrino*, 303 F.3d 107, 124 (2d Cir. 2002) ("[C]oercion may be found where one is given a choice between one's employment and one's constitutional rights."). Second, Defendant Landry's representatives, who appear to have no medical training, searched for and reviewed, and then attempted to obtain hard copies of, twenty of Hope's confidential medical patient charts. No authority provides the Attorney General and his agents carte blanche to seize such highly confidential information. *See State v. Skinner*, 10 So. 3d 1212, 1218 (La. 2009) (Fourth Amendment right to privacy extends to, and Louisiana has a heightened privacy interest for, medical records).

## II.    Hope and its Patients Will Suffer Irreparable Harm.

As applied by Defendants, the Notice would prevent patients from obtaining a previability abortion in the state. Accordingly, the Notice threatens "irreparable harm to [Louisianans'] abilities to control their 'destiny and . . . body.'" *Jackson Women's Health Org. v. Currier*, 2018 WL 1567867, at *1 (S.D. Miss. Mar. 20, 2018) (entering TRO against Mississippi 15-week abortion ban) (quoting *Casey*, 505 U.S. at 869).

It is well established that, where a plaintiff establishes a constitutional violation, no further showing of irreparable injury is necessary. *See Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." (citation omitted)); *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B Nov. 1981) (When "the constitutional right of privacy is 'either threatened or in fact being impaired,' . . . this conclusion mandates a finding of irreparable injury." (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

Further, forcing individuals to remain pregnant against their will inflicts physical and emotional consequences upon women that alone constitute irreparable harm. *See, e.g.*, *Elrod*, 427 U.S. at 373–74

(threatened and actual loss of First Amendment freedoms); *Deerfield Med. Ctr.*, 661 F.2d at 338 (alleged violation of women's right to privacy); *Jackson Women's Health Org. v. Currier*, 940 F. Supp. 2d 416, 423 n.6 (S.D. Miss. 2013), *aff'd*, 760 F.3d 448 (5th Cir. 2014). Forcing patients to remain pregnant subjects them to pregnancy symptoms and pregnancy risks. Mehta Decl. ¶ 27. Additionally, for individuals who have suffered trauma, such as sexual assault or domestic violence, pregnancy, childbirth, and an additional child may further exacerbate an already difficult situation.[38] As many medical professional organizations, including ACOG, have made clear in direct response to the COVID-19 crisis: abortion is "a time-sensitive service for which a delay of several weeks, or in some cases days, may increase the risks [to patients] or potentially make it completely inaccessible."[39] For some patients, such a delay will deprive them of any access to abortion, and as ACOG and others stated, the "consequences of being unable to obtain an abortion profoundly impact a person's life, health, and well-being."[40] This "disruption or denial of . . . patients' health care cannot be undone after a trial on the merits." *Planned Parenthood of Kan. & Mid-Mo. v. Andersen*, 882 F.3d 1205, 1236 (10th Cir. 2018) (internal quotation marks omitted), *cert. denied.*, 139 S. Ct. 638 (Mem.) (2018). In sum, immediate enforcement of the Notice will cause serious and irreparable harm to Hope.

**III.    The Injuries to Hope and its Patients Far Outweigh Any Harm to Defendants.**

Although Hope and its patients will suffer numerous irreparable harms without an injunction, Hope's requested relief will simply preserve the status quo. *See Jackson Women's Health Org.*, 940 F. Supp. 2d at 424 (because preliminary injunction order would "essentially continue[] the status quo,"

---

[38] Sarah C.M. Roberts et al., *Risk of Violence from the Man Involved in the Pregnancy After Receiving or Being Denied an Abortion*, 12 BMC Med. 144 (2014), https://bmcmedicine.biomedcentral.com/track/pdf/10.1186/s12916-014-0144-z. This is particularly worrisome in light of the fact that the United Nations has already seen "a horrifying global surge in domestic violence" during the COVID-19 pandemic. António Guterres, Sec'y-Gen., United Nations, *Make the Prevention and Redress of Violence Against Women a Key Part of National Response Plans for COVID-19* (last visited Apr. 13, 2020), https://www.un.org/en/un-coronavirus-communications-team/make-prevention-and-redress-violence-against-women-key-part.
[39] Am. Coll. of Obstetricians & Gynecologists et al., *Joint Statement on Abortion Access During the COVID-19 Outbreak*, *supra* note 4.
[40] *Id.*

balance of equities tips in favor of preliminary relief). Further, Defendants cannot be harmed by being prevented from violating the Constitution. *See Deerfield Med. Ctr.*, 661 F.2d at 338–39. And given the indefinite length of the Notice, it is likely that nearly all of Hope's patients will be delayed in receiving care or forced to forgo an abortion and carry an unplanned pregnancy.

Hope acknowledges the current public health crisis—and for many weeks has been taking steps in line with those required of other medical professionals who continue to provide essential healthcare to preserve PPE. But the Notice is not a short-term order, it has no time limitation. Pregnant Louisianans will need some medical care in the coming weeks and months—even in early pregnancy under current medical guidelines. Mehta Decl. ¶¶ 11–18. And Defendants' stated goals of preserving PPE and hospital resources will not be achieved by banning abortion in the state. *Id.* ¶¶ 27–33. Thus, there is no benefit to preventing abortion providers from using minimal PPE in providing care, and the harms of eliminating abortion access in the midst of a pandemic that increases the risks of continuing a pregnancy, as well as the risks of traveling to other states in search of time-sensitive medical care, far outweigh any purported marginal benefit. Indeed, these risks are underscored by the fact that Texas has imposed a mandatory 14-day self-quarantine on people traveling from Louisiana via roadways, setting up checkpoints at its Louisiana border and requiring such travelers to fill out a form with their designated quarantine location.[41] The balance of hardships tips decidedly in Hope's favor.

**IV.    Granting Emergency Relief Will Serve the Public Interest.**

As the Fifth Circuit has made clear: the public interest is served "when an injunction is designed to avoid constitutional deprivations." *Jackson Women's Health Org.*, 940 F. Supp. 2d at 424; *see also*

---

[41] Jeremy Blackman, *Travel from Louisiana Further Tightened by New Checkpoints*, Houston Chronicle (Apr. 5, 2020), https://www.houstonchronicle.com/news/houston-texas/houston/article/Travel-from-Louisiana-further-tightened-by-new-15180553.php; *see also* State of Texas, *Form for Arrivals from Areas Designated for Mandatory Self-Quarantine* (last visited Apr. 13, 2020), https://www.dps.texas.gov/covidtravel/groundTravel.pdf; Greg Abbott, Governor, Tex., Exec. Order GA-12 (Mar. 29, 2020) (imposing 14-day self-quarantine on people entering Texas "through roadways from Louisiana"), https://gov.texas.gov/uploads/files/press/EO-GA-12_roadway_quarantine_for_COVID-19_IMAGE_03-29-2020.pdf.

*Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996). Further, the public interest is well-served by "maintaining the status quo pending a full trial on the merits." *United States v. Texas*, 508 F.2d 98, 101 (5th Cir. 1975).

Here, immediate injunctive relief would protect individuals' constitutional right to access abortion care. Patients are currently scheduled for medication and procedural abortions this week. Without relief from the Court, these patients will either be forced to carry their pregnancies to term against their will, delay that care for weeks or months, or attempt to leave the state to obtain an abortion. Hope does not dispute the stated public interest in preserving PPE and hospital resources. But for the reasons articulated above, these interests are undermined by applying the Notice to abortion. Accordingly, an injunction serves the public interest and restraining Defendants from enforcing the Act will maintain the *status quo*.[42]

## CONCLUSION

For all these reasons, Hope respectfully requests that the Court issue a temporary restraining order and/or preliminary injunction to enjoin enforcement of the Notice, as interpreted by Defendants, to prohibit all previability abortion care, and for such further relief that the Court deems warranted.

*/s/ Ellie T. Schilling*

Jenny Ma*                                    Ellie T. Schilling
Caroline Sacerdote*                          Louisiana Bar No. 33358
Arielle Humphries*                           SCHONEKAS, EVANS, McGOEY
CENTER FOR REPRODUCTIVE RIGHTS               & McEACHIN, LLC
199 Water Street, 22nd Floor                 909 Poydras Street, Suite 1600
New York, New York 10038                     New Orleans, LA 70112
Phone/Cell: (917) 637-3705                   Phone/Cell: (504) 680-6050
Fax: (917) 637-3666                          Fax: (504) 680-6051
Email: jma@reprorights.org                   E-mail: Ellie@semmlaw.com

* Admitted *Pro Hac Vice*

ATTORNEYS FOR PLAINTIFF

---

[42] This Court should use its discretion to waive the Federal Rule of Civil Procedure 65(c) bond requirement here, where the relief sought will result in no monetary loss to Defendants. *See, e.g.*, *Planned Parenthood of Greater Tex. Family Planning & Preventative Health Servs., Inc. v. Smith*, 236 F. Supp. 3d. 974, 1000 (W.D. Tex. 2017), *overruled on other grounds by* 913 F.3d 551 (5th Cir. 2019).

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of April, 2020, a true and correct copy of the foregoing was served on counsel for Defendants via the Middle District of Louisiana's Electronic Filing System.

*/s/ Ellie T. Schilling*
Ellie T. Schilling